THE FRANKLIN TRUST COMPANY

*v.*

THE RUTHERFORD, BOILING SPRINGS AND CARLSTADT ELECTRIC COMPANY and CHARLES C. SOUTHARD.

[Decided April 9th, 1898. Filed January 4th, 1899.]

1. A by-law of a corporation provided that five-eighths of its stock should be represented at every stockholders' meeting. The stock was divided into three thousand shares. At such a meeting only four of the stockholders were present, who represented four hundred and sixty-nine shares. The wives of two of such stockholders held one thousand shares each, but the minutes did not show that they were present, or that any proxies were presented for them. The proof showed that the husbands did present proxies for their wives, and voted on their stock.—*Held*, that bonds issued at such meeting were valid.

2. In an action of foreclosure it appeared that the mortgagor was a New Jersey corporation, but the mortgage was executed in New York. The answer set up usury under the New Jersey law, but made no affirmation as to the laws of New York.—*Held*, that being a New York contract, its validity should be determined by the laws of that state, and, there being no allegation as to those laws, defendant was cut off from the defence of usury.

3. A corporation agreed to sell $40,000 of its bonds and $5,000 of its stock for $33,000, the purchaser to take up $15,000 of bonds of a prior issue, and pay the balance in money. He obtained the latter bonds for $14,000, and received the receipt of the president of the company for $15,000.—*Held*, that for the purpose of carrying out his contract he was entitled to the $15,000 as a payment.

4. Upon foreclosure of a mortgage given to secure an issue of bonds by a corporation, it was contended that the loan was extortionate. Evidence showed that $40,000 of the bonds secured by the mortgage and $5,000 of the stock of the company were given for $33,000; that the security for the loan was of doubtful value; that the money was advanced at times of financial stringency, and that the present stockholders had purchased the great majority of the stock with notice of the mortgage, and that subsequently and before suit began the company, under their management, entered into an agreement of compromise with the bondholders and their trustee, settling the amount due upon an equitable basis and had since defaulted in payment. It was held that complainant was entitled to a decree of foreclosure, and that the computation of the amount due should be based upon the compromise agreement.

Heard on bill, answer and proofs.

*Mr. William H. Corbin,* for the complainant.

*Mr. Addison Ely,* for the defendant company.

PITNEY, V. C.

This is a bill to foreclose a mortgage given by the defendant corporation to the complainant corporation to secure an issue of fifty bonds of $1,000 each.

The complainant corporation is organized under the laws of the State of New York, and located at Brooklyn, in said state. The defendant corporation is located in Bergen county, in the State of New Jersey. The mortgage covers the defendant corporation's electrical plant, situate in the neighborhood of Rutherford, in said county. It bears date May 1st, 1893, acknowledged June 26th, 1893, by the mortgagor, and by the mortgagee, complainant, on June 27th, 1893, and was recorded on June 28th, 1893. The bonds are payable in twenty years after date, with semi-annual interest coupons annexed, at three per cent. each, and the mortgage and the bonds also provide that each year thereafter the defendant corporation shall pay to the complainant, in addition to the interest, the sum of $2,000, with which it shall purchase and cancel two of the bonds; and it also contains a provision that, in case of failure for three months so to do, the whole of the bonds shall become due and payable.

The complainant, by its bill, alleges that all the $50,000 of bonds were issued and negotiated by the defendant corporation and came to the hands of the defendant Charles C. Southard; that the sinking fund for the spring of 1894 and of 1895 was provided, and that four of the bonds were paid therewith, leaving forty-six outstanding, all in the hands of the defendant Southard; that the sinking fund for 1896 and 1897 was not provided; that the interest for May 1st, 1897, was not paid in full, and that the interest for November 1st, 1895; May 1st, 1896, and November 1st, 1896, was only paid in part; whereupon, at the request of the defendant Southard, the holder of the bonds, the complainant declared the whole mortgage due and filed its bill to foreclose on the 14th of June, 1897. Afterwards, on July 28th, 1897, interest to the extent of $1,080 was deposited with it by the defendant corporation, but whether accepted by Mr. Southard does not appear.

The defence by the defendant corporation is—*first*, that the bonds and mortgage were executed and delivered in pursuance of a written contract entered into between the defendant corporation and one George H. Southard, by which said Southard agreed to advance certain sums of money on account thereof at certain specified times, and that said contract and the mortgage, though executed by the officers of the company, never received the sanction of a proper meeting of the board of directors or a proper meeting of the stockholders of the corporation, as required by law, and are therefore void; *second,* usury, in that the bonds were sold by the defendant corporation at a usurious rate to George H. Southard, who is the brother of Charles C. Southard, and who was, at the time, the president of the complainant corporation, and that Charles C. Southard is not a *bona fide* holder of the bonds; *third,* that if the bonds are not usurious, then that Southard never did, in fact, advance the money according to his contract, and that the contract was, in its terms, so grossly unfair and extortionate on the part of Southard as to be a fraud upon the stockholders in general of the company, and that Southard is not entitled to declare the bonds to be due at this time, because, after charging him with

the amount that he actually extorted from the company at the start, there is no default in the letter of the contract.

There is little dispute as to the actual facts in the case. The circumstances are these: On the 1st of May, 1893, the Electric company's affairs were in this condition: it had, nominally, $30,000 of stock, divided into three thousand shares, of $10 each. The books do not show, distinctly, how that stock was held, as no stock ledger was kept, but as to five hundred of the three thousand shares, there can be no doubt that they were held as follows: By a Mr. Brunner, one share; Mr. Alyea, five shares; Mr. Mada, ten shares; Mr. Soley, fifteen shares; in all, thirty-one shares, of the par value of $310, which were held by parties not in the management of the company. The other shares actually issued at that time were—to a Mr. Appleton, one hundred and eighty-two shares; to a Mr. Jordan, one hundred and eighty-two shares; to a Mr. Burrows, fifty shares, and to a Mr. Buys, fifty-five shares, making four hundred and sixty-nine, and with the thirty-one before mentioned, five hundred shares. Appleton and Jordan were, respectively, the president and treasurer, and Burrows and Buys were employes of the company. On May 15th, 1893, one thousand shares were issued to the wife of Jordan and one thousand shares to the wife of Appleton. Whether they had been previously regularly allotted to them, so that they were the substantial owners at any time prior to the 15th of May, does not appear. Adding those, we have the total stock issued $25,000. In addition, there was, on the 15th of May, 1893, a certificate made out to Mr. George H. Southard for five hundred shares, making up the whole three thousand. But, as will appear hereafter, Mr. Southard was not at that time entitled to the issue of that stock to him, and for present purposes I shall hold that he was not the holder of it at that time.

The plant of the company was then subject to a previous mortgage given to a New Jersey trustee to secure fifteen bonds of $1,000 each, which were held by various persons in different parts of the United States. Appleton, as we have seen, was the president, Jordan the secretary and treasurer, and Buys and

Burrows employes. Those four constituted the whole or a majority of the directors.

Mr. Appleton, the president, claimed that the company was indebted to him for cash advanced to the extent of $14,000. Of this alleged claim there is no proof.

In that situation, Mr. Appleton, who, as well as Mr. Jordan, lived in Brooklyn, applied to Mr. George H. Southard, the president of the complainant company, who also lived in Brooklyn, to advance some money to the company, and the result was an agreement in writing dated the 3d. of May, 1893, purporting to be between the defendant corporation, executed by its president, Mr. R. Ross Appleton, and Mr. George H. Southard as an individual, which witnessed that the defendant corporation agreed to sell to Mr. Southard $40,000, being part of an issue of $50,000 of first mortgage six per cent. gold bonds, secured by a first mortgage to the Franklin Trust Company, complainant, upon all the plant of the defendant company, and also to sell to him $5,000 at par of fully-paid stock of said company, all for the sum of $33,000, payable as follows: May 9th, $6,000; July 1st, $6,000; July 15th, $6,000; August 15th, $5,000; September 1st, $5,000, and October 1st, $5,000, the bonds to be dated May 1st, 1893, payable twenty years after date; the mortgage to provide for a sinking fund of $2,000 annually, to be paid to the trustee and used by it in redeeming $2,000 of the bonds in each year, providing for the drawing of the bonds to be canceled by lot if the same could not be purchased at par, the remaining $10,000 of bonds to be issued only for extensions and betterments; and the defendant corporation agreed that part of the proceeds of the sale of the $40,000 of bonds should pay off and cancel the $15,000 of mortgage bonds outstanding against the property. The contract also provided that the corporation should submit, within ten days of the date of the contract, a resolution to the action of its board of directors, approving the contract and authorizing the issue of the bonds, and also a similar resolution to the vote of its stockholders at its annual meeting to be held May 16th, 1893. The mortgage and bonds were to be ready for delivery on or before the 1st of July,

1893, and Southard agreed to make the stipulated payments for the $40,000 of bonds and $5,000 fully-paid stock upon delivery to him of $7,000 of the old issue on May 9th, and $8,000 of the old issue on July 1st, 1893, together with the whole $40,000 of the new bonds; and the defendant corporation agreed to deliver to Southard for cancellation all of the old issue of $15,000 on or before the 1st of July, 1893.

That agreement was submitted to a meeting of the board of directors, on the 16th of May, 1893, and unanimously approved, and also to a meeting of the stockholders on that day with a like result.

The proofs do not show how the meeting of stockholders was called. They do show that the four stockholders—Appleton, Jordan, Burrows and Buys, representing in their own right four hundred and sixty-nine shares of the stock—were present. The minutes do not show that their wives were present or that any proxies were present for them. The proofs tend to show that Messrs. Appleton and Jordan represented their wives, and Mr. Buys, who acted as secretary, swears that they did present the proxies of their wives and voted on their stock.

The validity of this meeting is attacked on the ground that the by-laws require that five-eighths of the stock should be represented at every stockholders' meeting, and that the proxies are not produced.

It appears that, in the summer of 1894 or 1895, Appleton and Jordan, and, I believe, Burrows and Buys, sold out their stock to a Mr. Ferree, who at present owns most of the stock of the concern and is promoting this defence, and all their books and papers were passed over into his possession. The proxies in question were not produced when called for by the complainant, and the counsel of defendant corporation denies all knowledge of them.

I hold upon the evidence that if the issue of the shares of stock to Mrs. Appleton and Mrs. Jordan on the day before this annual meeting of stockholders constituted them stockholders, then that the evidence satisfies me that they were present by their husbands, who acted as their agents and as their proxies.

Besides, before the Appletons and Jordans and Mr. Burrows and Mr. Buys assigned their stock to Ferree, the contract of May 3d, as ratified by the directors and stockholders on May 16th, was many times recognized and ratified.

So much for the lack of authority of the officers of the corporation to execute the mortgage and the bonds.

The next question is as to the defence of usury.

The answer sets up usury under the laws of New Jersey, and makes no affirmation as to the laws of New York. The proofs show that all the negotiations were had between Appleton, as president of the corporation, and George H. Southard, as proposed purchaser of the bonds, and that those negotiations took place in the State of New York. There is no proof that Mr. Southard was present at either the directors' or stockholders' meetings in New Jersey, or that he ever was in New Jersey, except once to examine the plant. The mortgage and bonds were all executed in the State of New York, and I am constrained to hold that this is a New York contract, and that its validity must be determined by the laws of the State of New York. As there was no allegation of those laws in the answer, the defendant corporation is cut off from the defence of usury. But had it been set up in the answer, it would not have availed as a defence, because it was admitted substantially at the hearing that by the laws of New York a corporation cannot set up the defence of usury, and if that statute had been proven it is well settled that this court must apply it.

The next point is the extortionate character of the contract, and that Mr. George H. Southard never advanced the money that he agreed to advance. In the regular course of business he was entitled to have the old issue of $15,000 delivered up and canceled so that the complainant corporation could certify on each of the new bonds that it was secured by a first mortgage. That the new mortgage was intended to be a first mortgage is not open to dispute. Appleton undertook to hunt up these old bonds and to arrange with the holders to send them to the Franklin Trust Company to be redeemed, and Mr. Southard agreed to pay for them as fast as they came in and in advance

of his strict legal obligations to do so under the contract of May 3d, 1893. Mr. Appleton did so, and the bonds were sent in in batches from different holders, accompanied with drafts from distant points, through a New York bank, and those drafts were met and paid by Mr. Southard. It may be inferred, although there is no positive proof of that fact, that Mr. Appleton succeeded in getting the whole $15,000 of bonds for the sum of $12,000, that being the amount, approximately, of the drafts accompanying the same which Mr. Southard paid; but he also paid $2,000 directly to Mr. Appleton, making $14,000 in all paid out for the $15,000 of bonds; $6,000 of that were paid some considerable time prior to the date fixed by the contract, and by an arrangement between him and the corporation it allowed him two per cent.—$120—for such prior payment, which, added to the amount paid upon drafts directly to the holders of the bonds and $2,000 paid to Mr. Appleton, amounted to just $14,000. But he holds the receipt of Mr. Appleton, as president of the company, for $15,000 on that account.

This state of facts raised a question at once as to whether or not he was entitled to consider the $14,000 actually paid as a payment of $15,000 on account of his contract to pay $33,000, and that was one of the questions argued.

If he had previously bought all of those bonds and had been the holder of them at the time the contract was entered into, I should say, without hesitation, that he was entitled to the whole face of the bonds; but only $6,000 was paid in advance of his contract, and for that he claimed and received a discount of $120. And his counsel frankly stated that if the court had any doubts about Mr. Southard's right to claim that extra $1,000 he would submit to a deduction on that account. So I shall hold that, although he had the receipt of the company for $15,000, still, for the purposes of final accounting with the defendant corporation, he is entitled to a credit of only $14,000. But, for the purpose of fulfilling his contract to furnish $33,000 in exchange for the $40,000 of bonds of the company, it must be considered as a payment of $15,000. The remaining $18,000 was paid from time to time, but not in accordance with the

terms of the original contract. The stringency of the money market in the summer of 1893 was such that the defendant company, by Mr. Appleton, its president, granted a partial extension of time, running up to the 18th of January, 1894, and that extension is in writing, added to the original agreement. The payments were, in the end, all made.

A portion of those payments was applied to the payment of the coupons falling due on the $40,000 of bonds on the 1st of November, 1893, and by such payment Southard undoubtedly received interest for moneys he had never advanced.

On the 1st of May, 1894, by the terms of the mortgage, $2,000 was to be paid on account of principal, and bonds to that amount were to be retired. On that day—May 1st, 1894—the defendant company was unable to meet the payment of $2,000 and the interest due that day, and a new contract in writing was entered into between the parties, by which the defendant company agreed to sell to Mr. Southard—and Mr. Southard agreed to purchase—the remaining $10,000 of the whole issue at the price of $7,000, of which $5,200 was to be paid in cash on that date, $1,500 on the 1st of November, 1894, and $300 on the 1st of May, 1895. The $5,200 to be paid on the date of that agreement was applied as follows: Four thousand dollars was used to retire $4,000 of bonds, two to be paid on that day, under the agreement, and two to be paid in one year from that date, to wit, on May 1st, 1895, and $1,200 was applied toward paying the coupons due that day on the bonds already issued. That left in the hands of Mr. Southard $44,000 of bonds. The remaining $1,800 were subsequently paid and the other two bonds delivered, making him the holder of forty-six bonds, of which foreclosure is sought.

In the fall of 1894 the stock of the company held by Appleton and Jordan and their party was sold to a Mr. Ferree, who, with his son, became the holder of the whole of the stock and took up the management of the plant. Shortly after Ferree came into the control of the company, disputes arose between him and Mr. Southard holding all these bonds, as to the amount

advanced on them, and as to the amount on which interest should be paid, which resulted in a new contract entered into between the defendant company and Southard, on the 4th of February, 1896. By that agreement the electric company agreed to make certain improvements in, and additions to, their plant, and consented to the extension of the lien of Southard's mortgage upon such additions; that the interest due on the 1st of November, 1895, should be paid as upon $36,000 of bonds; that the agreement for the extension of the mortgage lien should be ratified at a formal meeting of the directors of the company and at a regularly-called stockholders' meeting. Southard, on his part, agreed that the complainant trust company should consent to the selling of some old engines and dynamos, the proceeds of which should be applied toward the improvements; that he would accept $1,080 payment of interest, being three per cent. on $36,000, on November 1st, 1895; that upon the plant being improved in the manner provided for, he would surrender and deliver up $10,000 of the bonds for cancellation, reducing the amount outstanding to $36,000, but that of the amount so surrendered $5,000 should be considered as full payment for the $5,000 of capital stock which he held, and that upon that being done the electric company would execute a certificate that the mortgage and outstanding bonds to the extent of $36,000 were good and valid and given for value, and that there were no defences thereto in law or in equity.

That agreement was executed by the two Ferrees, father and son, one as president and the other as treasurer of the company.

That contract was never carried out in full by the electric company. They paid interest on the reduced number of bonds, but did not make the $2,000 sinking fund payment which fell due on the 1st of May, 1896, nor that which fell due on the 1st of May, 1897. The result was that the bill was filed.

This contract of February 4th, 1896, was not set out in the original bill, nor was it set up in the answer, but came out at the hearing, and then the evidence with regard to the performance of it on each side was fully gone into, with the result that

I conclude that the electric company was in default, and that Southard, as holder of the bonds, was not in default.

Complainant, at the hearing, offered to abide by the contract of February 4th, 1896, if the electric company would undertake to carry it out, and obtained leave to file an amendment to its bill, by which it sets out that agreement and offers to submit to such terms with regard to it as the court shall think are just and equitable under the circumstances. That contract was, I think, eminently just and fair, and its adoption by the court will eliminate the charges of extortion and unfairness in the original contract. The security for the loan was of doubtful value, and the loan a risky one. The money was advanced at a period of great financial stringency; the actual borrowers—the persons then owning and controlling all the stock of the defendant corporation—were amply able to take care of themselves in the transaction, and are not now complaining of it. The parties now defending purchased the stock with full notice of the mortgage, and hence do not occupy the position of being directly oppressed.

For these reasons, my conclusion is that the complainant is entitled to relief, and that under the circumstances it is just and equitable that it should have a decree for $35,000, viz., $1,000 less than fixed by the compromise agreement, with the arrears of unpaid coupons on thirty-five bonds, and a decree of foreclosure in which a provision shall be made for the extension of the principal according to the terms of the original mortgage, provided the interest and costs are paid.